UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Janet F. Sheeley and Peter J. Lilja-Sheeley,

    Plaintiffs,

v.

**MEMORANDUM OPINION AND ORDER**
Civil No. 12-2525 ADM/SER

City of Austin, Chad Norman,
and Kevin Sederquest,

    Defendants.

───────────────────────────────────────────────

Leslie Lienemann, Esq., Culberth & Lienemann LLP, St. Paul, MN, on behalf of Plaintiffs.

Anna Yunker, Everett & VanderWiel, PLLP, Rosemount, MN on behalf of Defendants.

───────────────────────────────────────────────

This matter came before the undersigned United States District Court Judge on March 19, 2015 on Defendants City of Austin, Chad Norman, and Kevin Sederquest's ("the City Defendants") Motion for Summary Judgment [Docket No. 77]. At the hearing, Plaintiffs requested permission to file a supplemental brief in support of their motion and that request was granted [Docket No. 93]. After review of the parties' initial and supplemental briefing, the City Defendants' motion is granted.

## I. BACKGROUND

**A. November 16, 2011 Emergency Call**

On November 16, 2011, Austin City Police Officers Chad Norman and Kevin Sederquest and Gold Cross Ambulance paramedics Jessica Bird and Emily Anderson were dispatched on a 911 call to a home in Austin, Minnesota. Yunker Aff. [Docket No. 80] Ex. 4 ("Norman Dep.") 13–14; Yunker Aff. Ex. 5 ("Sederquest Dep.") 10–11. The caller, later identified as Dustin Sheeley ("Dustin"), reported that his brother, Scott Sheeley ("Scott"), was having a seizure.

Norman Dep. 14–16; Sederquest Dep. 10:3–11:25; May Aff. [Docket No. 81] Ex. 1 ("Police Report") 3. Descriptions of the events at the home differ somewhat.

The City Defendants maintain that Officers Norman and Sederquest and the paramedics arrived at the house at approximately the same time. Norman Dep. 16:21–25; Sederquest Dep. 11:11–25; Yunker Aff. Ex. 6 ("Bird Dep.") 16:10–12. Officer Norman heard noises coming from the basement and was the first to proceed downstairs, immediately followed by Officer Sederquest and the paramedics. Norman Dep. 18:21–19:13; Sederquest Dep. 13:18–14:12. Upon reaching the bottom of the stairs, the group observed Scott, naked from the waist down, swinging a pair of pants at his brother Dustin. Norman Dep. 20:1–10; Sederquest Dep. 14:4–24. Scott then dropped the pants and swung his fist in Dustin's direction. Norman Dep. 20:14–20; Sederquest Dep. 14:20–15:6, 16:11–22; Bird. Dep. 19:5–10 ("Scott was attempting to hit his brother, his brother was attempting to restrain him. He appeared very out of control and his brother was having a hard time."). According to Officer Norman, Scott's punch made contact with Dustin's shoulder. Norman Dep. 20:14–20.

The Officers instructed Scott to get down on the ground, but he did not comply. Sederquest Dep. 20:6–21:3. A struggle ensued and the Officers attempted to bring Scott to the ground to place him in handcuffs. Norman Dep. 24:1–26:10; Sederquest Dep. 20:6–21:20. The Officers eventually forced Scott into a kneeling position facing a cushioned chair, with his thighs and stomach touching the chair. Norman Dep. 25:1–26:19; Sederquest Dep. 16:23–18:16. Scott continued to struggle and disregard the Officers' commands to put his hands behind his back. Norman Dep. 26:25–27:22; Sederquest Dep. 20:20–2121:3. While Scott was kneeling in front of the chair, Officer Norman grabbed hold of Scott's left arm and Officer Sederquest held Scott's

2

right arm in an attempt to handcuff him. Norman Dep. 28:4–8; Sederquest Dep. 18:20–19:3. However, the Officers could not sufficiently control Scott to get his arms behind his back. Norman Dep. 28:9–25; Sederquest Dep. 19: 4–20:15. The struggle continued for several minutes, causing Officer Norman to call for backup assistance. Norman Dep. 32:5–25. While attempting to restrain Scott with his left arm, Officer Norman removed his taser from his duty belt. Norman Dep. 35:7–15, 36:25–37:4. Paramedic Anderson removed the cartridge from the end of the taser so that the taser could be utilized in drive-stun mode. Police Report 3; Norman Dep. 38:9–13; Yunker Aff. Ex. 7 ("Anderson Dep.") 85:3–5. Officer Norman warned Scott that "[y]ou need to put your hands behind your back or you're going to be tased." Norman Dep. 39:6–11. When Scott did not comply, Officer Norman applied the taser to Scott's upper back. Norman Dep. 43:4–44:4. Scott appeared to have no response to the taser and continued to struggle. Id. Officer Norman then tased Scott a second time, again with no immediate effect.[1] Id. 43:25–47:21. Paramedics Anderson and Bird did not believe that Scott was experiencing a seizure during the struggle. Bird Dep. 51:7–11 ("I did not believe that he was having a seizure . . . He was not presenting in the normal fashion of seizure activity."); Anderson Dep. 124:17–125:18 ("I did not believe [Scott] was in a seizure.").

Shortly after Officer Norman tased Scott, Officer Ryan Lief arrived to provide backup assistance. Norman Dep. 52:11–21. With Officer Lief's help, Officers Norman and Sederquest were able to get Scott's arms close enough together behind his back so that he could be handcuffed. Id. 52:11–21; Sederquest Dep. 32:14–23. Despite being handcuffed, Scott

---

[1] In his written police report, Officer Norman estimated that he tased Scott three or four times. However, upon downloading the data from his taser, Officer Norman determined that his taser fired twice. Norman Dep. 47:13–21.

continued to struggle. Norman Dep. 53:3–55:2; Sederquest Dep. 34:4–20. The paramedics then injected Scott with Haldol and Ativan in an attempt to sedate him. Bird Dep. 36:23–38:12; Norman Dep. 55:3–12; Sederquest Dep. 36:5–9. Approximately one minute later, Scott stopped struggling. Norman Dep. 56:22–57:14. Paramedic Anderson continued to monitor Scott's breathing after he was sedated. Id. 57:22–58:5. A few minutes later, Anderson reported that Scott had stopped breathing and no longer had a pulse. Id. 57:22–58:2. The Officers immediately removed Scott's handcuffs and commenced CPR while the paramedics called for backup assistance. Id. 58:19–59:20. Shortly thereafter, two additional paramedics arrived. Bird Dep. 54:17–56:10. The paramedics revived Scott, and he was transported to the hospital. Sederquest Dep. 38:11–39:4. Scott later reported having no memory of the events of November 16, 2011. Yunker Aff. Ex. 12 at 14.

**B. Dustin Sheeley's Account of the November 2011 Incident**

On May 17, 2012, Dustin completed an affidavit in connection with this action. Lienemann Decl. [Docket No. 87] Ex. 1 ("D. Sheeley Aff."). Dustin's recitation of the events varies slightly from that of the officers and paramedics. See generally id. Dustin reported that, after hearing a loud crash in the basement, he found Scott passed out on his back with his eyes rolled to the back of his head. Id. ¶¶ 7–8. Dustin called 911 to report his brother was having a seizure. Id. ¶ 8. While his brother was making the emergency call, Scott got up and started to move around. Id. ¶ 9. Dustin stated that Scott was agitated and "kept banging into things, like he was trying to get out of [a] box." Id. Dustin assisted Scott in removing his pants, as Scott had urinated on himself several times. Id. ¶ 10.

After the police officers and paramedics arrived, Scott swung his pants at Dustin. Id. ¶

4

11. The Officers then intervened, attempting to restrain Scott and shoving him face down into a chair. Id. ¶ 11. According to Dustin, at this point the Officers were able to handcuff Scott, but they additionally continued to push him face down into the chair by pressing their knees into his back. Id. Throughout this struggle, Scott was convulsing and Dustin repeatedly yelled at the Officers that Scott was having a seizure. Id. ¶¶ 12–13. A third police officer restrained Dustin against the wall. Id. ¶ 12. Despite Dustin's repeated pleas that his brother was having a seizure, an officer tased Scott "at least four times after he was restrained in the chair and after he was handcuffed." Id. ¶ 14. The paramedics then administered a shot to Scott, at which point he stopped moving. Id. ¶ 15. An officer pushed Dustin into another room and eventually moved him upstairs. Id. ¶¶ 16, 19. After a few minutes, Scott was removed from the basement, unconscious and unresponsive. Id. ¶ 21. Later, Dustin returned to the basement to clean up and noted that "Scott had shaken so violently and so much that he skinned both knees while seizing in the chair leaving blood stains on the carpet." Id. ¶ 22.

**C. Procedural Background**

Scott filed this lawsuit in October 2012 and asserted six claims against four named Defendants: (1) a 42 U.S.C. § 1983 claim against Officers Norman and Sederquest for excessive force in violation of the Fourth Amendment; (2) a 42 U.S.C. § 1983 claim against Officers Norman and Sederquest for deliberate indifference of Scott's medical needs in violation of the Fourteenth Amendment; (3) a failure to claim train against the City of Austin pursuant to Monell v. Department of Social Servs. of the City of New York, 436 U.S. 658, 694 (1978); (4) an Americans with Disabilities Act ("ADA") claim against the City of Austin; (5) a common law battery claim against Officers Norman and Sederquest; and (6) a negligence claim against Gold

Cross Ambulance Service ("Gold Cross"). See Compl. [Docket No. 1].

In December 2013, two years after the incident and a year after the filing of this action, Scott died. Mem. in Supp. of the City Def.s' Mot. for Summ. J. [Docket No. 62] 3. The cause of Scott's death was declared "undetermined." Id. In March 2014, Janet Sheeley and Peter Lilja-Sheeley, Scott's mother and son, were approved by the Court as "co-personal representatives of the estate of Scott Raymond Sheeley." Order [Docket No. 52]. Dustin Sheeley died unexpectedly before his deposition could be taken in this action. Yunker Aff. ¶ 14.

Gold Cross moved for summary judgment on October 2, 2014, arguing that because Plaintiffs had not asserted a claim for special damages, Plaintiffs could not recover pursuant to the limitations of Minn. Stat. § 573.02. See Mem. Supp. Summ. J. On February 6, 2015, the Court granted Gold Cross's Motion for Summary Judgment related to the negligence claim, concluding that Plaintiffs could not maintain their cause of action against Gold Cross because Plaintiffs had not obtained trustee status as required by Minn. Stat. § 573.02. See Order [Docket No. 83].

The City Defendants now move for summary judgment on the remaining claims. In their initial memorandum in support of this motion filed on February 1, 2015, the City Defendants argue that Plaintiffs' claims fail on the merits. The Court issued its Order granting Gold Cross's Motion for Summary Judgment on February 6, 2015. In their reply memorandum filed on March 8, 2015, the City Defendants added the argument that the excessive force, deliberate indifference, Monell, and battery claims also fail due to Plaintiffs' failure to be designated as trustees pursuant to Minn. Stat. § 573.02. As City Defendants failed to raise this argument in their initial memorandum, Plaintiffs filed a Motion to Strike Reply Memorandum [Docket No.

91] and requested an opportunity to file additional briefing on the trustee issue. The Court granted Plaintiffs' request for supplemental briefing. On March 27, 2015, Plaintiffs submitted a supplemental memorandum [Docket No. 93] arguing that the trustee requirement of Minn. Stat. § 573.02 is inapplicable to the current claims.

## II. DISCUSSION

### A. Standing

#### 1. Minn. Stat. § 573.02

The Court first addresses whether Plaintiffs have standing to assert claims arising out of the personal injury of Scott. A party's standing to pursue a claim is an element of the Court's Article III jurisdiction and thus must be determined as a preliminary matter. Frey v. City of Herculaneum, 44 F.3d 667, 670 (8th Cir. 1995) (citing Landrum v. Moats, 576 F.2d 1320, 1323, n.2 (8th Cir. 1978)). The City Defendants argue that Plaintiffs' claims asserting a personal injury—the excessive force, deliberate indifference, Monell, and battery claims—must be dismissed for lack of standing because Plaintiffs have not been designated trustees as required under Minn. Stat. § 573.02.[2] Plaintiffs counter that the survivorship of the Section 1983 claims is governed by federal common law, not Minn. Stat. § 573.02 and therefore, the trustee requirement of the state statute is inapplicable (at least to the claims brought under Section 1983). Plaintiffs further argue that other courts within this district have found estate representatives to be proper substitutes for a plaintiff who died during the pendency of a lawsuit. The Court agrees with the City Defendants that Janet Sheeley and Peter Lilja-Sheeley lack

---

[2] The City Defendants do not dispute Plaintiffs' standing to assert the ADA claim, calling only for the dismissal of Counts I, II, III, and V on the trustee status argument.

standing to assert the claims in Count I, II, III, and V.[3]

Federal law does not explicitly articulate the extent to which civil rights claims under Section 1983 survive the death of the plaintiff. Robertson v. Wegmann, 436 U.S. 584, 589 (1978). In Robertson, the Supreme Court held that state survivorship statutes provide "the principal reference point in determining survival of civil rights actions, subject to the important provison that state law may not be applied when it is inconsistent with the Constitution and laws of the United States." Id. at 590. As explained by the Eighth Circuit, "[u]nder 42 U.S.C. § 1988(a) (1994), in this situation we look to state law to determine who is a proper plaintiff, as long as state law is not inconsistent with the Constitution or federal law." Andrews v. Neer, 253 F.3d 1052, 1056 (8th Cir. 2001) (citing Robertson, 436 U.S. at 588–90 (1978)).

At common law, a claim for personal injury died with the victim. Ortiz v. Gavenda, 590 N.W.2d 119, 121 (Minn. 1999) (citing Fussner v. Andert, 261 Minn. 347, 350-53 (Minn. 1961)). This principle is now codified in Minnesota by statute, Minn. Stat. § 573.01, subject only to specific exceptions. Section 573.02, subd. 2 specifies that an appointed trustee is limited to seeking special damages for personal injuries to a decedent who died from causes unrelated to

---

[3] Plaintiffs moved to strike the City Defendants' reply brief because it asserted "arguments not raised in the opening memorandum." Mot. Strike Reply Mem. The Court acknowledges that the City Defendants did not argue dismissal on the trustee status ground until the filing of their reply brief on March 8, 2015, presumably in response to the Court's February 6, 2015 Order granting summary judgment for Gold Cross based on Plaintiffs' failure to secure trustee status. However, whether or not Plaintiffs' claims satisfy the requirements of Minn. Stat. § 573.02 is an issue of standing. See Abed v. Wong, No. 05-281, 2006 WL 1116115, at *3–4 (D. Minn. Apr. 24, 2006). The question of whether the Court has subject matter jurisdiction over a claim "may be raised at any time by a party to an action, or by the court *sua sponte*." Bueford v. Resolution Trust Corp., 991 F.2d 481, 485 (8th Cir. 1993). Plaintiffs' Motion to Strike Reply Memorandum is therefore denied. Plaintiffs have now had an opportunity to fully brief and argue their position on the trustee status ground for dismissal.

those injuries:

> [w]hen injury is caused to a person by the wrongful act or omission of any person or corporation and the person thereafter dies from a cause unrelated to those injuries, the trustee appointed in subdivision 3 may maintain an action for special damages arising out of such injury if the decedent might have maintained an action therefore had the decedent lived.

Minn. Stat. 573.02, subd. 2.[4] Special damages consist of damages "to which an exact dollar amount can be assigned, such as medical expenses or lost wages to date of death." Tezak v. Bachke, 398 N.W.2d 37, 39 (Minn. Ct. App. 2005).

Here, Plaintiffs argue that the trustee requirement of Minn. Stat. § 573.02 is inapplicable to the Section 1983 claims because the statute itself is inconsistent with federal law. Specifically, Plaintiffs maintain that because Minn. Stat. § 573.02 restricts the remedies available under Section 1983 by limiting recoverable damages to special damages only, this contradicts Section 1983 and, accordingly, Robertson demands that federal common law should be applied rather than Minn. Stat. § 573.02.

Plaintiffs cite a Northern District of California case Williams v. City of Oakland, 915 F. Supp. 1074 (N.D. Cal. 1996), for the proposition that a state survivorship statute limiting recoverable damages to special damages contravenes Section 1983. In Williams, the court

---

[4] Throughout the progression of this case, the parties and this Court have referenced both Minn. Stat. § 573.02, subds. 1 and 2 during arguments related to Plaintiffs' trustee status. Subdivision 1 of the statute pertains to incidents of wrongful death—that is, when the wrongful act that forms the basis of a claim causes the original plaintiff's death. Although there originally appeared to be some ambiguity regarding whether Plaintiffs were claiming that the actions of Defendants eventually resulted in Scott's death, Plaintiffs have now clearly stated that they are not asserting a wrongful death claim. Pl.s' Supplemental Mem. Opp'n Summ. J. 6 ("Plaintiffs do not pursue a wrongful death action against any City Defendant . . ."). Thus, the Court proceeds with its evaluation under Subdivision 2, although it notes that the trustee requirement unequivocally pertains to both subdivisions.

concluded that a California survivorship statute that extinguished damages for pain and suffering was inconsistent with Section 1983 because "to deny pain and suffering damages would strike at the very heart of a Section 1983 action." Id. at 1077.

Although the Eighth Circuit has not explicitly addressed whether Minn. Stat. § 573.02 conflicts with the purposes of Section 1983, it has evaluated an Arkansas survival statute which abated certain civil rights claims and found that the statute was not inconsistent with federal civil rights law. See Parkerson v. Carrouth, 782 F.2d 1449 (8th Cir. 1986). In so concluding, the Eighth Circuit stated:

> [a]bsent an infirmity of constitutional dimensions in that law, it is not for a federal court to say that a rule established for Arkansas by its lawmakers is unreasonable or unwise. We recognize that state lawmakers may perceive the existence of sound reasons for abating certain kinds of claims upon the death of the party allegedly injured.

Id. at 1455. The same reasoning is applicable here. Moreover, no provision of Minn. Stat. § 573.02 operates to disturb the legislative purposes of § 1983—that is, the Court agrees with a previous court's ruling in this district that "the survival law thwarts neither the function of deterring future civil rights violators nor that of compensating those whose rights have been violated." Crocker v. City of Minneapolis, No. 4-85-923, 1986 WL 266, at * 2 (D. Minn. July 3, 1986). The Court therefore finds that Minn. Stat. § 573.02, subd. 2 is not inconsistent with federal civil rights laws and the state survivorship statute governs.

Plaintiffs also rely on Gilbert v. Metro. Prop. and Cas. Ins. Co., No. 09-1990 JRT/JSM, 2011 WL 4730535 (D. Minn. Oct. 7, 2011), in support of their general contention that courts within this district have found that *estate representatives* may properly serve as substitutes for plaintiffs who have died during the course of a personal injury action. In that case, the court

allowed the daughter of the original plaintiff to proceed on a Minnesota Human Rights Act claim as a personal representative under Minn. Stat. § 573.02, subd. 2 after the plaintiff's death. However, in so reasoning, the court quoted Section 573.02, subd. 2 and replaced the term "trustee" with the bracketed phrase "decedent's representative or successor." While likely unintended, Gilbert's modification of the statutory language substantially altered the scope of the statute. The Court declines to follow this material change from the express words of the statute.

In sum, Plaintiffs' arguments regarding trustee status are unavailing. The Court's reasoning and application of the requirements of Minn. Stat. § 573.02 has not changed from its February 6, 2015 Order. The statute's trustee requirement is unambiguous and Plaintiffs have failed to obtain trustee status. Without being a trustee, Plaintiffs cannot maintain personal injury claims under Minn. Stat. § 573.02, subd. 2 and, for this reason alone, Plaintiffs' claims against the City Defendants for excessive force, deliberate indifference to serious medical needs, Monell liability, and battery are dismissed for lack of subject matter jurisdiction.

**2. Request to Obtain Trustee Status**

In a supplemental memorandum, Plaintiffs request that, should the Court find trustee status necessary, they be given leave to seek trustee appointment. This request is denied. Even after summary judgment was granted in favor of Gold Cross in February 2015, Plaintiffs have apparently made no effort to obtain trustee status. Critically, however, even if Plaintiffs were appointed trustees and had standing to assert the claims here, such claims would likely be denied on the merits.

Simply put, the evidentiary hurdles facing Plaintiffs are overwhelming. In support of their version of events and to identify potential issues of material fact, such as whether Scott was

11

having a seizure and not acting violently and the events surrounding the use of the taser, Plaintiffs rely heavily on the affidavit of Dustin Sheeley. Dustin was never deposed, and he is now deceased. The City Defendants maintain that the affidavit would be inadmissible at trial as it does not fall within any hearsay exception. See Fed. R. Evid. 804.

When evaluating whether or not it is proper to consider an affidavit in the course of summary judgment proceedings, "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir.012) (citing Fed. R. Civ. P. 56(c)(2)) (emphasis in original). If the claims proceeded to trial, the Court could not properly consider Dustin's affidavit and Plaintiffs have not shown that evidence supporting their version of events could be presented in some other admissible form. In other words, Plaintiffs can point to no record evidence beyond the disputed affidavit in support of their contention that Scott was behaving in a nonviolent manner and that he was tased after being handcuffed and restrained. Plaintiffs have no other witness to provide supporting testimony as to their version of events. In sum, without Dustin's account, no genuine issue of material fact would remain pertaining to the Section 1983 and battery claims and the City Defendants would likely be entitled to summary judgment on the merits.

**B. Summary Judgment**

The City Defendants do not challenge Plaintiffs' standing to assert a claim under the ADA. Accordingly, the Court shall evaluate Plaintiffs' sole remaining claim on the merits.

**1. Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary

judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "While a party moving for summary judgment has the burden of showing that there is no genuine issue of fact for trial, a nonmoving party seeking to avoid having summary judgment entered against it may not rest on mere allegations or denials, but must set forth specific facts sufficient to raise a genuine material issue for trial." Thomas v. Runyon, 108 F.3d 957, 959 (8th Cir. 1997).

A fact dispute is "material," and will thus preclude summary judgment, only if the dispute "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And where the moving party has carried its burden, the nonmoving party must then "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The "very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56(e) advisory committee's note to 1963 Amendment.

**2. ADA Claim**

Plaintiffs assert that the City of Austin ("the City") violated the ADA by denying Scott the benefit of law enforcement services and by failing to properly train officers on how to restrain individuals during a "Sick Cared For" call. Compl. ¶¶ 90–91. The City responds that whether the ADA is even applicable to an officer's actions prior to an arrest is uncertain. However, even if the ADA is applicable here, the City contends that no violation occurred. The Court agrees, finding that the City is entitled to summary judgment.

Title II of the ADA states that "no qualified individual with a disability shall, by reason

13

of such disability . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To assert a prima facie claim under the ADA, a plaintiff must establish that he (1) qualifies as a person with a disability as defined in the statute; (2) was excluded from receiving benefits, services, programs, or activities of a public entity; and (3) this exclusion was due to the disability. Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998) (citing Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998)).

The City is correct that some ambiguity surrounds whether the ADA is applicable to an officers' actions prior to an arrest. The Fifth Circuit, for example, has held that Title II cannot be applied to law enforcement's "on-the-street responses," reasoning that

> [l]aw enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents.

Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000).

The Eighth Circuit has not issued a similarly broad holding on the ADA's applicability prior to an arrest. However, the Circuit has stated that the "inquiry into whether officers reasonably accommodated the individual is 'highly fact-specific and varies depending on the circumstances of each case, including the exigent circumstances presented by criminal activity and safety concerns . . . .'" DeBoise v. Taser Intern., Inc., 760 F.3d 892, 899 (8th Cir. 2014) (quoting Bahl v. Cnty. of Ramsey, 695 F.3d 778, 784–85 (8th Cir. 2012)). For example, in Bahl, the Eighth Circuit evaluated the ADA's application to a traffic stop scenario. 695 F.3d 778 (8th Cir. 2012). In that case, the plaintiff, who was deaf, drove through a red light during rush hour.

14

Id. at 781. After being pulled over, the plaintiff gestured that he wanted to communicate in writing, but the officer performing the stop communicated only through simple gestures. Id. at 781–82. The plaintiff claimed that the officer's actions during the traffic stop were in violation of the ADA. Id. at 784–86. The court disagreed, stressing that the situation escalated from a routine traffic stop because the plaintiff had run a red light (thereby creating a public safety hazard) and that it would "not second guess [police officers'] judgments, where, as here, an officer is presented with exigent or unexpected circumstances." Id. at 785. In these circumstances, it would be unreasonable to require that certain accommodations be made in light of overriding public safety concerns." Id. at 785–86.

In the instant case, the Officers were not obligated to present ADA accommodations on the scene. Although Officers Norman and Sederquest were responding to a dispatch of a medical call, the situation quickly escalated and presented exigent circumstances. Upon descending the stairs to the basement, the Officers immediately witnessed Scott's combative and unpredictable behavior. Viewing the facts in the light most favorable to the Plaintiffs, once the Officers entered the basement they observed Scott—naked from the waist down—throwing his pants at his brother and acting in an erratic manner. The situation then escalated, with Scott repeatedly failing to comply with the Officers' instructions and physically resisting attempts to restrain him. The Court will not "second-guess" the Officers' actions and demand ADA compliance when the Officers were managing an unexpected scenario that continued to evolve and increase in intensity.

The Court also finds that the City of Austin did not violate the ADA by failing to train its police officers for several reasons. First, similar to failure to train claims pursuant to § 1983,

ADA claims asserting failure to train require proof of deliberate indifference. Roberts v. City of Omaha, 723 F.3d 966, 975–76 (8th Cir. 2013). Accordingly, Plaintiffs can only prevail on an ADA failure to train claim by "showing the city's deliberate indifference to his alleged right to be free from discrimination in the circumstances of this case." Id. at 976. If the right sought was not clearly established at the time of the incident, this forecloses a municipal liability for failure to train because "the risk of harm was not so obvious at the time of the incident that the municipality's actions could properly be characterized as deliberate indifference." Id. (internal quotation and citation omitted).

Plaintiffs maintain that under the ADA, Scott had a right "to be handled in a safe and appropriate manner consistent with his disability." Pl. Mem. in Opp'n to Summ. J. [Docket No. 86] 37. In support of this contention, Plaintiffs cite to Gorman, where the Eighth Circuit evaluated the post-arrest transportation of a paraplegic confined to a wheelchair, concluding that "[the plaintiff's] allegations that the [officers] denied him the benefit of post-arrest transportation appropriate in light of his disability fall within the framework of . . . the ADA . . . ." 152 F.3d at 913. However, the Eighth Circuit has since stated that "Gorman does not explain what duties, if any, the ADA . . . impose[s] on officers who are attempting to secure a potentially violent suspect in an uncertain and rapidly evolving situation." Roberts, 723 F.3d at 973. The situation the Officers faced here, even based on Dustin Sheeley's version of events, was a physically out of control individual in a rapidly evolving situation. Scott was combative and unresponsive—throwing his pants and failing to abide by or respond to any instructions of the Officers. Accordingly, Gorman does not serve to put the Officers or the City of Austin on notice at the time of the incident in 2011 that the actions taken were in violation of the ADA.

Second, Plaintiffs have not shown that more adequate or different training on how to properly respond to a "Sick Cared For" call with an individual experiencing a seizure would have resulted in the Officers managing the situation any differently. See Thao v. City of St. Paul, 481 F.3d 565, 568 (8th Cir. 2007) (affirming summary judgment on an ADA failure to train claim when the plaintiffs failed to show that further training would have required a different response from police officers) ("Without deciding the adequacy of the officers' training, or whether a municipality can be liable under the ADA for a 'failure to train,' we conclude that the Plaintiffs have failed to demonstrate that more 'adequate' training to accommodate the [disabled individual] would have required a different response."). Plaintiffs argue that the City produced only one policy pertaining to officers interacting with disabled individuals and highlight that the policy has not been updated since its publication on September 13, 1976. Plaintiffs then summarily conclude that "[t]he City of Austin has failed to fulfill its duty to self-evaluate its policies and training under the ADA." Pls.' Mem. Opp'n Summ. J. at 38. The City counters that the failure to update this written policy is irrelevant, as the policy only provides instructions regarding investigations related to the third parties discriminating against disabled individuals. Regardless of the policy's content, simply the existence of an out-of-date written policy is insufficient to confer liability on the City for failure to train. The Officers actions were in response to the behavior they observed. Giving credence to Dustin's claims that Scott was having a seizure and they were responding to a "Sick Cared For" call, the Officers subsequently observed Scott's combative behavior and failure to comply with their commands and proceeded accordingly. Critically, both paramedics at the scene did not believe that Scott was having a seizure. No reasonable jury could conclude based on the facts offered by Plaintiffs that the

17

Officers would have responded differently had they received additional training related to the ADA.

Finally, it was not the City of Austin's failure to train that precipitated the Officers' actions to restrain and eventually tase Scott, but rather Scott's aggressive behavior and failure to obey the commands issued by the Officers. See Sanders v. City of Minneapolis, 474 F.3d 523, 527 (8th Cir. 2007) (finding that a city defendant did not violate the ADA for failure to train when the plaintiff's actions of attempting to run over law enforcement with his vehicle caused the use of deadly force); see also DeBoise v. Taser Intern., Inc. No. 14:10CV818, 2013 WL 3419730 (E.D. Mo. July 8, 2013) ("County's failure to train did not bring about the use of tasers, but [the plaintiff's] aggression and refusal to comply with the officers' commands."). The City of Austin is entitled to summary judgment on Plaintiffs' ADA claim.

### III. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' motion is **GRANTED** and Plaintiffs' Complaint **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:

   s/Ann D. Montgomery   
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 5, 2015.